William A. Prater v. Commissioner. William Alexander Prater, d/b/a Prater Chenilles v. Commissioner.
Prater v. Commissioner
Docket Nos. 18825, 35980.
United States Tax Court
1953 Tax Ct. Memo LEXIS 161; 12 T.C.M. (CCH) 872; T.C.M. (RIA) 53263; July 31, 1953
*161 Petitioner was sole proprietor of a chenille bedspread factory during 1944 and 1945. Deposits in and withdrawals by check from his principal bank account purported to reflect his total income and expenses. Petitioner engaged in extensive "black market" buying of materials for use in his factory. Most "black market" purchases were paid for in cash. Petitioner failed to deposit sizeable amounts of cash in his account and withdrew large amounts by checks made payable to cash. He understated the amount of taxable net income in his returns, which were filed on the cash receipts and disbursements basis. No Georgia state income taxes were paid for either year in question. 1. Held, petitioner's returns were not false or fraudulent with intent to evade tax. 2. Held, further, petitioner is not entitled to a deduction for accrued and unpaid Georgia state income taxes for the years in question. John A. Smith, Sr., Esq., Talbotton, Ga., for the petitioner. Ralph V. Bradbury, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax and penalties, as follows: Docket
Taxable
Income
50%
Nos.
Years
Tax
Penalty
18825
1944
$86,138.71
$43,069.36
35980
1945
70,714.00
38,111.86
The issues to be determined are: (1) whether there was an understatement of net taxable income on returns filed by petitioner for the years in question; (2) if so, whether such understatements were false or fraudulent with intent to evade tax; and (3) whether petitioner is entitled to deductions on his Federal returns for accrued Georgia state income taxes for both taxable years here in question. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. William A. Prater (hereinafter referred to as the petitioner) resided in Calhoun, Georgia, during 1944 and 1945, *163 and supported his wife, mother and father. He filed Federal income tax returns on the cash receipts and disbursements basis for those years with the collector of internal revenue for the district of Georgia. In November 1943, petitioner stopped working as a clerk in a grocery store and, early in 1944, became the sole proprietor and operator of a chenille bedspread factory known as Prater Chenilles. He continued to operate the factory during 1945 and for several succeeding years. Until 1944 he had no substantial amount of income. His first Federal income tax return was filed for the calendar year 1941. Petitioner maintained no books and few records for Prater Chenilles. He relied exclusively on bank deposits and withdrawals by check to reflect costs, sales, and profits. Many such checks, payable to cash, were written in pencil, and few notations as to the use of the proceeds were made on their face at the time they were drawn. Petitioner frequently made cash purchases. He also often cashed customers' checks instead of depositing them or withheld cash from the total face amount of such checks which were deposited. Petitioner's formal schooling did not continue beyond the seventh *164 grade. He had no knowledge or understanding of bookkeeping and accounting methods. He employed no bookkeeper during either of the years in question. Accountants were employed to prepare his tax returns for those years. A set of books covering the first three months of 1945 was prepared by one of the accountants for petitioner's use during that year. They were not, however, kept beyond March 31. Petitioner maintained his principal bank account at The Calhoun National Bank, Calhoun, Georgia. This account purported to reflect his total business operations. He also maintained a checking account at The First National Bank of Rome, Rome, Georgia, which was used primarily as a personal savings account. Petitioner did not disclose the existence of this Rome checking account to either his accountants or to the internal revenue agent. During the years in question, petitioner purchased, for cash and sometimes by check, sizeable quantities of merchandise for use in his business at so-called "black market" prices in violation of maximum ceiling prices established by the Office of Price Administration (hereinafter referred to as O.P.A.) under authority of the Emergency Price Control Act of *165 1942, as amended. The amount in excess of the authorized O.P.A. ceiling price was almost always paid in cash. Petitioner reported net income, gross sales, and cost of goods sold for the years in question, as follows: Years
Net Income
Gross Sales
Cost of Goods Sold
1944
$ 9,962.32
$180,173.41
$164,514.71
1945
8,028.49
146,229.04
133,004.49
1945 (Amended)
20,569.87
0
0 Petitioner filed the amended return for 1945 on May 6, 1948, subsequent to the initiation of the investigation by the respondent. As a basis for correcting the amount of net income originally reported for the year 1945, petitioner determined his net worth as of December 31, 1943, and December 31, 1947. A part of the total increase in net worth during that period was arbitrarily allocated to each of those four years. Respondent determined petitioner's net income for 1944 to be $121,572.05 and for 1945 to be $110,101.22. Deficiencies and 50 per cent fraud penalties have been determined. Respondent's determination was made on the basis of specific adjustments in the amount of petitioner's reported gross sales and cost of goods sold. For the year 1944, respondent added to reported gross *166 sales the amount of $70,041.39 alleged to be additional receipts not deposited in The Calhoun National Bank. The sum of $41,568.34, representing checks made payable to cash, was deducted from the reported cost of goods sold. For the year 1945, respondent added $92,055.73, alleged to be additional receipts, to the amount of reported gross sales. The sum of $10,017, representing checks made payable to cash, was deducted from the reported cost of goods sold. On March 15, 1950, a grand jury returned an indictment against petitioner for income tax evasion under section 145 (b) of the Internal Revenue Code. Count 1 of the indictment covered the year 1944; count 2, the year 1945. On April 14, 1950, petitioner entered a plea of nolo contendere to count 1; the United States Attorney moved to dismiss the indictment as to count 2. On May 22, 1950, an order, signed by the Judge of the United States District Court for the Northern District of Georgia, suspended sentence in petitioner's conviction on count 1, placed him on probation for three years, and granted the Government's motion to dismiss count 2 of the indictment. The transit records of The Calhoun National Bank, *167 and petitioner's deposit slips showing cash deductions from the total face amount of checks deposited, established that during 1944 petitioner handled $73,118.65 in cash which was not deposited in this principal bank account. The sum of $82,896.15 was similarly withheld during 1945. During 1944 petitioner purchased $36,596.07 of sheeting, yarn, and other materials for use in his bedspread manufacturing plant from the Mount Alto Bed Spread Co., Inc. (hereinafter referred to as Mt. Alto), of Calhoun, Georgia. Of this amount, $15,102.89 represented the authorized O.P.A. ceiling price for the materials; $21,493.18 represented the "black market" additional cost. Of the total amount purchased, $1,453.55 was paid by check; $35,142.52 was paid in cash. Invoices from Mt. Alto show purchases on June 19, 1944, of $447.81. On that date, petitioner issued a check to Mt. Alto of $1,079.35; the difference represented the "black market" excess. On April 14, 1944, invoices from Mt. Alto show purchases by petitioner of $592.29; the "black market" price totalled $1,465.80. On that day, petitioner drew a check on The Calhoun National Bank, payable to cash, for $1,400. On July 25, 1944, invoices of *168 Mt. Alto show purchases by petitioner of $645.46; the "black market" price totalled $1,579.40. On that day, petitioner drew a check on The Calhoun National Bank, payable to cash, for $1,600. One Dennis Payne operated a trucking business in Calhoun, Georgia, during the years here in question. He hauled, from Atlanta to Calhoun, eight loads of yarn and other materials which petitioner purchased from one Dave Epstein in 1944, and seven such loads so purchased in 1945. On these trips, petitioner carried from $500 to $8,000, in cash, on his person. In 1944 petitioner paid Epstein $17,670.69 in cash and $10,329.31 by check for materials purchased. Cash payments were made in Atlanta in Epstein's office from which his wife, bookkeeper, and all others were excluded at the time. In 1945 petitioner paid Epstein $24,500 in cash for materials purchased under similar circumstances. In 1944 petitioner purchased for cash $12,000 worth of materials from one J. M. Hunt. Petitioner purchased materials from the Rosedale Company during 1944 and 1945. $1,871 of such purchases was paid by petitioner with checks drawn on his Rome, Georgia, bank account in 1944 and $2,374.65 by check in 1945. The payee *169 of such checks was the Rosedale Company. Petitioner made a cash purchase of materials from R. P. Nance, on October 16, 1944, amounting to $1,504.70. During the years here in question, petitioner carried on a substantial amount of business with one Phil Leon of New York, New York. Many checks drawn by Leon, and admitted into evidence, are in payment of attached invoices of Prater Chenilles for bedspreads described by a specific style number. Similar invoices, attached to checks received in payment thereof from other of petitioner's customers, are for spreads manufactured by him and described by identical style numbers. A net worth statement, attached to petitioner's amended return for the year 1945, shows assets, on December 31, 1943, of approximately $9,000; on December 31, 1944, of approximately $18,000; and on December 31, 1945, of approximately $43,000. Petitioner's accountant, in computing his taxable net income for 1944, allowed approximately $4,000 for personal living expenses. Petitioner paid no Georgia state income taxes for 1944 or 1945. His taxable net income was understated on his Federal income tax returns for those years, but such returns were not false or fraudulent *170 with intent to evade tax. Opinion RICE, Judge: We are convinced on this record that the petitioner did not file false and fraudulent returns with intent to evade tax for the two years in question; nor did he realize taxable income for either year in as large an amount as respondent determined. Respondent contends that petitioner's failure to maintain adequate records, his large understatement of total sales, and his plea of nolo contendere to the criminal action against him, point to a clear intent to file false and fraudulent returns. These facts, however, must be placed against the background of petitioner's very limited education; his rather abrupt change of occupation from that of a grocery clerk to that of proprietor of a profitable chenille berspread factory; his complete lack of knowledge or understanding of bookkeeping and accounting methods; and his substantiated explanation of some transactions from which unfavorable inference might otherwise be drawn. We think the facts upon which the respondent relies, so placed against this background, are not sufficient to sustain his burden of proving, by clear and convincing evidence, that the petitioner's returns were false *171 and fraudulent with intent to evade tax. As we said in Walter M. Ferguson, Jr., 14 T.C. 846, 849 (1950): "Their sudden prosperity [and] alleged ignorance * * * are inadequate excuses for their incorrect returns. They should have kept better records and they should have known that the net income reported was substantially less than their actual income * * *. An investigation on their part could easily have disclosed the errors. * * * But suspicion of incredible ignorance or of actual knowledge * * * is not enough. Negligence, careless indifference, or disregard of rules and regulations would not suffice. The petitioners dismissed their responsibility to file proper returns much too lightly. But the Commissioner, to support the fraud penalties, must prove by clear and convincing evidence that the taxpayers, * * *, intended to defraud him. * * *" While petitioner need not show what his correct tax liability is, he has the burden of proving the error in respondent's determination of that liability. Hague Estate v. Commissioner, 132 Fed. (2d) 775 (C.A. 2, 1943), certiorari denied 318 U.S. 787 (1943); Helvering v. Taylor, 293 U.S. 507 (1935). *172 Petitioner's account in The Calhoun National Bank supposedly reflected the total receipts and expenditures of Prater Chenilles. The basis of respondent's determination of deficiencies asserted herein was his discovery that $73,118.65 had been withheld from deposits, and that $41,568.34 had been withdrawn by checks payable to cash in 1944, and $82,896.15 and $10,017 in respective similar amounts had been withheld and withdrawn in 1945. At the trial, petitioner testified freely with respect to his extensive "black market" buying in violation of established O.P.A. prices. We have no doubt that his purchases of materials at "black market" prices were sizeable and frequent, and that a large amount of the cash withheld from deposits and the proceeds of checks drawn, payable to cash, were used for that purpose. Such purchases, if substantiated, would properly be included in computing petitioner's cost of goods sold. Lela Sullenger, 11 T.C. 1076 (1948). Petitioner must do more, however, than describe his extensive "black market" activities. Other evidence in the record corroborates his testimony with respect to certain purchases so made. We think the evidence in the record *173 sufficient to justify an addition to cost of goods sold for the year 1944, in the amount of $35,142.52, representing cash purchases from Mt. Alto. The evidence also is sufficient to substantiate petitioner's claim that $17,670.69 was paid in cash to one Dave Epstein for "black market" purchases, and should be added to cost of goods sold in 1944. Similarly, the amount of $12,000, representing cash "black market" purchases from J. M. Hunt and $1,871 for materials purchased from the Rosedale Company, should also be added to cost of goods sold in that year. Of the many checks made payable to cash and drawn in the year 1944, few can be sufficiently identified as representing specific "black market" purchases so as to warrant our allowing the amount of them to be added to cost of goods sold. One such check, however, in the amount of $1,504.70, bearing the notation "RPN" on its face, should be allowed as an addition to the cost of goods sold in that year. For the year 1945, petitioner has sufficiently corroborated his testimony as to the purchases from Dave Epstein so as to warrant an addition of $24,500 of "black market" purchases to cost of goods sold. A check drawn on petitioner's so-called *174 "savings" checking account, in the First National Bank of Rome, in the amount of $2,374.65, in payment of materials purchased from the Rosedale Company, should also be added to the cost of goods sold for that year. Petitioner attempted to explain a large portion of the amounts withheld from deposits in 1944 and 1945 as being the proceeds of Phil Leon's checks, for whom petitioner alleged he purchased merchandise on a commission basis. The evidence in the record does not substantiate his contention. In 1948, petitioner's accountant made a recomputation of his net income on the basis of increased net worth. Pursuant to this recomputation, petitioner admits an understatement of net taxable income for the years in question. While the value of assets, which petitioner admits holding at the beginning and end of the taxable years here in question as well as for several subsequent years, and the modest amount of his living expenses might more accurately point to a lower net taxable income than the amount determined by respondent, the petitioner has not succeeded, except in instances noted herein, in rebutting the prima facie correctness of respondent's determination. In several instances, *175 witnesses could have been subpoenaed to corroborate petitioner's testimony and additional books and records could have been obtained. It is not the function of this Court to dig out and develop a taxpayer's case. As we said in Producers Crop Improvement Association, 7 T.C. 562, 565 (1946): "* * * This is not to say that the Court is indifferent to the results reached or that it would not turn its hand to do justice where it could properly assist one party or the other to that desirable end. The point is that the parties have the primary duty of presenting their cases, * * *." Petitioner, who filed his returns on the cash receipts and disbursements basis, is not entitled to a deduction for accrued and unpaid Georgia state income taxes for the years here in question. Sidney Weinburg, 1 B.T.A. 178 (1924). Decision will be entered under Rule 50.